### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PHILADELPHIA COMMUNITY** | : | |
| **DEVELOPMENT COALITION** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 25-246** |
| | : | |
| **AGNES A. WELLS, *et al.*** | : | |

**McHUGH, J.**                                                                                                    **July 7, 2025**

### MEMORANDUM

This case arises out of a collision of two remedial statutes, one state and one federal. Pennsylvania's Blighted and Abandoned Property Conservatorship Act provides a vehicle for communities to address abandoned properties in their neighborhood.  The Federal Home Equity Conversion Mortgage Program allows senior citizens to tap equity in their homes to support aging in place.  The state statute accomplishes its goals by allowing for the appointment of a conservator to remediate blight, compensating that conservator and protecting their interest with a priority lien. The federal statute facilitates issuance of reverse mortgages by providing guaranties to lenders that sometimes transform into liens.  Here, a local non-profit seeks to conserve a property no longer occupied by its elderly owner, but because of a reverse mortgage, the property is encumbered by a lien held by the U.S. Department of Housing and Urban Development ("HUD").  If a conservator were appointed and secured a priority position as a lienholder, HUD's interest would necessarily be impacted.  HUD therefore removed the conservatorship action from state court and now seeks dismissal of the petition based on sovereign immunity.  An ideal resolution would allow these programs to work in tandem, but I can discern no credible reading of federal law that would support such a result.  I am therefore constrained to grant the Government's motion.

## I.     Relevant Background

182 West Durham St. ("the Property") is a single-family home on a tree-lined street in the Mount Airy neighborhood of Philadelphia. Mot. to Remand at 8, ECF 5 ("Rem.").[1] The Property belongs to Ms. Agnes A. Wells, who now resides at a complete care facility.[2] Pet. for the Appointment of a Conservator, ¶¶ 9-11, ECF 6 ("Pet."). Without any identified heirs to the Property, it now sits vacant and abandoned. *Id.*, ¶ 15, 22.

### 1. *The HECM Mortgage*

On October 18, 2011, Mr. and Ms. Wells obtained reverse mortgage financing with a private lender through the federal Home Equity Conversion Mortgage program ("HECM").[3] HECM Note, ECF 12-1. The HECM program, operated pursuant to Section 255 of the National Housing Act, is a federal program that allows elderly homeowners to access equity in their property so that they may age in place.[4] 12 U.S.C. § 1715z-20. The HECM program is underwritten by the Federal Housing Administration's ("FHA") Mutual Mortgage Insurance Fund, 12 U.S.C. § 1715z-20(i), and is governed by a robust series of federal regulations, codified at 24 C.F.R. §§ 206 *et seq*.

---

[1] Page numbers reflect pagination designated by the ECF system.

[2] Mr. Wells died on or about February 4, 2024, leaving Ms. Wells the sole owner of the Property. Pet., ¶ 10.

[3] There are actually two mortgage liens recorded against the Property, both through the HECM program. Both mortgages were assigned from the underlying private lender, Generation Mortgage Company, to HUD. Both mortgages incorporate the same "Security Agreement" and operate together as HUD's senior reverse mortgage. Rem. at 9-10.

[4] The Federal Housing Administration, an agency within HUD, also insures HECM mortgages, therein insulating private lenders from risk and incentivizing them to lend to elderly homeowners. 12 U.S.C. § 1715(z)-20(a).

On March 18, 2017, the private lender that had originally contracted with Mr. and Ms. Wells through the HECM program assigned their mortgage to HUD.[5]  Assignment, ECF 12-2.  As a result of the assignment, HUD holds a validly and properly perfected first priority lien on the Property.  Fingerlin Decl., ¶ 8, ECF 12-4.  Repayment of a HECM loan is not required until (a) the property is sold; (b) the borrower(s) no longer uses the property as his or her primary residence; (c) the borrowers die; (d) or when the borrower(s) breach a term of the loan agreement.  24 C.F.R. § 206.27(c).  Upon the occurrence of any of the above events, the entire balance of the loan becomes due and payable.  *Id*.  At some point over a year ago,[6] Ms. Wells moved to a complete care facility with no intention to return to the Property, rendering it vacant and the loan due and payable.  Pet., ¶ 11.  The only way for the Government to recoup its HECM funds is through foreclosure and sale of the property.  HECM Note, ¶ 9.

Congress enacted the Foreclosure Act "to create a uniform Federal foreclosure remedy for single family mortgages that are held by the Secretary of HUD pursuant to … the National Housing Act," including properties acquired pursuant to the HECM Program.  12 U.S.C. § 3751(b)(1); *id.* § 1710(g).  Where foreclosure is appropriate on a HUD-held mortgage, the National Housing Act empowers HUD to "sell real and personal property … on such terms and conditions as the Secretary may prescribe."  *Id.* § 1710(g).  Accordingly, HUD is authorized by both the HECM

---

[5] A private lender may assign their HECM mortgage to HUD if certain circumstances are met.  24 C.F.R. § 206.107.  At the time of assignment, HUD pays a claim for insurance benefits from the Mutual Mortgage Insurance Fund to the private lender.  When this occurs, HUD assumes the role of lender and is responsible for servicing the loan.

[6] The limited record does not specify when Ms. Wells moved.

mortgage and the Single Family Mortgage Foreclosure Act of 1994 to conduct a foreclosure sale. 12 U.S.C. §§ 3751 *et seq*. ("Foreclosure Act").

When the federal Government disposes of property under National Housing Act programs, it strives to maximize return to the Mutual Mortgage Insurance Fund, for this return of funds is what allows federal programs, such as the HECM program, to continue.  24 C.F.R. § 291.1(a)(2); *see also Sec'y of HUD v. Sky Meadow Assoc.,* 117 F. Supp. 2d 970, 974 (C.D. Cal. 2000) ("HUD must sell and dispose of properties acquired under the Single Family Mortgage Insurance Program pursuant to federal guidelines.  The properties must be disposed of in a manner that … ensures a maximum return to the mortgage insurance fund.") (citations omitted).  Sales made pursuant to the Foreclosure Act may be made "as is,"  without any rehabilitation, seeking to facilitate maximum return.[7]  24 C.F.R. § 291.210.

The Foreclosure Act also ensures a uniform mechanism for the Government to efficiently manage its properties, because "disparate state laws" governing foreclosure of single-family mortgages "burden certain programs administered by the Secretary," "increase the costs of collecting obligations," and "seriously impair the ability of the Secretary to protect the Federal financial interest in the affected properties and frustrate attainment of the objectives of the underlying Federal program authority."  12 U.S.C. § 3751(a).  Supporting uniformity of process,

---

[7] The Government's preference to sell its properties in "as-is" condition, without any rehabilitation, is guided by experience.  Prior to the mid-1970s, HUD's standard practice was to repair houses before marketing them.  But it found that doing so resulted in frequent vandalism, contractor fraud, and dissatisfied buyers who would rather have done renovations themselves.  HUD determined such that fraud and waste frustrated the purpose of the National Housing Act, and shifted their policy to allow for sale of properties "as-is."  *See U.S. v. City of St. Paul*, 258 F.3d 750, 752-53 (8th Cir. 2001) (discussing *Burroughs v. Hills*, 741 F.2d 1525 (7th Cir. 1984)).

the Foreclosure Act mandates a distinct priority schedule for payments under its terms.  12 U.S.C. § 3762(a).

### 2. PCDC Files for Conservatorship

Despite HUD's authority to foreclose on the Property, it failed to act, allowing the Property to sit abandoned.[8]

On November 20, 2024, the Philadelphia Community Development Coalition ("PCDC") filed a Petition for the Appointment of a Conservator under the Pennsylvania Abandoned and Blighted Property Conservatorship Act ("Act 135") in the Philadelphia Court of Common Pleas, seeking to be appointed conservator over the Property.  68 P.S. §§ 1101 *et seq*; Pet., ¶ 24.  Act 135 is a state scheme that empowers local communities to address nuisance properties.  *Id.* § 1102. Act 135 petitions are typically brought in state court, where there are a series of hearings to determine whether conditions exist to justify conservatorship, whether the homeowner can be given an opportunity to remediate, and if conservatorship is deemed appropriate, who should be appointed.  *Id.* §§ 1104-1105.  In their Petition, PCDC asserts that the Property meets the requirements under Act 135 for imposition of a conservatorship, in which PCDC would rehabilitate the Property and offer it for private sale.  Pet., ¶¶ 15-27.

Two provisions of Act 135 are particularly relevant here.  First, Act 135 incentivizes community groups to take action with regard to abandoned properties by requiring that, if the

---

[8] The parties dispute how long the Property sat abandoned.  PCDC's Petition states that the Property had not been legally occupied for at least twelve months preceding November 13, 2024, the date on which they filed their Petition.  Pet., ¶ 15.  But PCDC represented at oral argument that the Property was vacant for seven years.  Tr. of Oral Arg., 21:15-17, ECF 24.  HUD can only say that as of February 21, 2025, the Property was eligible for a HUD Field Manager to control the property.  Fingerlin Decl., ¶¶ 9-10. Regardless, it is undisputed that Ms. Wells left the property, leaving it vacant and unattended.

"petition states conditions for conservatorship," "the owner shall reimburse the petitioner for all costs incurred by the petitioner in preparing and filing the petition in accordance with the requirements of section 4 and the conservator's or developer's fee," regardless of who is appointed conservator or whether the petition is promptly terminated.  68 P.S. § 1105(f).  The conservator's fee can be (1) an amount equal to $2,500, adjusted upward by 2% each year; (2) a 20% markup of the costs and expenses for construction or stabilization; or (3) up to 20% of the sale price of the property, whichever is greatest.  *Id.* § 1103.  Second, Act 135 also dictates a priority schedule for payment upon sale of the property, which specifies that court costs, liens of the Commonwealth or a municipality, costs and expenses of sale, interest on any borrowing, costs incurred in filing the petition, and costs of rehabilitation of the property *all* take priority over "valid liens and security interests."  *Id.* § 1109(d).

As of March 13, 2025, the total balance on HUD's senior reverse mortgage was $468,985.28, and the Property was last assessed for tax purposes to be worth $382,300.[9]  Certif. of Indebtedness, ECF 12-3; Pet., Ex. B at 20, ¶ 3.  Thus, if any party other than HUD is appointed conservator over the Property, HUD's lien risks extinguishment or at least diminution.   The total balance HUD is owed already exceeds the assessed property value, and HUD falls sixth on the priority list for payment, making it unlikely that funds would remain to satisfy HUD's entire lien.

Once an Act 135 Petition is filed, state courts typically conduct an evidentiary hearing to determine whether a conservatorship is warranted based on the condition of the property at the time of filing, prior to determining who the conservator should be.  68 P.S. § 1105(a).  But before

---

[9] Typically, within the City of Philadelphia market value is higher than assessed value.  In addition to HUD's HECM lien, the only other encumbrance on the property is a City of Philadelphia real estate tax lien for $4,621.49.  Pet., Ex. B at 21, ¶ 6(b).

this hearing could occur here, HUD removed the action to federal court as a party-in-interest due to their lien on the Property. ECF 1. I denied PCDC's motion to remand, holding that the Act 135 Petition was sufficiently "directed to" the federal government such that removal pursuant to Section 1442 was proper. *See Phila. Cmty. Dev. Coal., Inc. v. Wells*, No. 25-246, 2025 WL 1160048 at *4-5 (E.D. Pa. Apr. 21, 2025).

Seemingly spurred to action by the PCDC Petition after years of inactivity, HUD represents that as of February 21, 2025, HUD has placed the Property into "custodial care" and assigned a Field Service Manager, who provides property preservation and protection services. Fingerlin Decl., ¶¶9-10. HUD states that it is "prepared to promptly begin" a nonjudicial sale of the Property pursuant to the Foreclosure Act, but is waiting for resolution of this action before proceeding as a courtesy. *Id.*, ¶ 12.

HUD now moves to dismiss, arguing that sovereign immunity strips the suit of jurisdiction.[10] PCDC responds that there is no need to waive sovereign immunity where federal interests are not imminently implicated, and in the alternative, that Section 2410's limited waiver applies.

## II.    Standard of Review

HUD argues that the action should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). A plaintiff bears the burden of establishing subject matter jurisdiction. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991). If a court determines at any time that it lacks subject-matter jurisdiction, it must dismiss the action. Fed. R. Civ. P.

---

[10] HUD also argues that the action should be dismissed pursuant to Rule 12(b)(6) because the state law is preempted, and pursuant to 12(b)(5) for failure to properly serve the federal Government. I decline to reach these arguments because the threshold question of sovereign immunity is dispositive here.

12(h)(3). The 12(b)(1) jurisdictional challenge here is facial. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "[T]he standard is the same when considering a facial attack under Rule 12(b)(1) or a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Petruska v. Gannon Univ.*, 462 F.3d 294, 299 n.1 (3d Cir. 2006) (citation omitted). In both instances, the Court must accept as true all material allegations laid out in the complaint and construe those facts in favor of the nonmoving party. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003).

### III.    Discussion

"A waiver of sovereign immunity must be express and unambiguous to confer subject matter jurisdiction on a court." *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 396 (3d Cir. 2012). Both Act 135 and the HECM program meaningfully serve the public good. But complete adherence to Act 135 procedures would necessarily impinge on the robust federal scheme undergirding the HECM program. Because PCDC fails to establish a clear waiver of sovereign immunity, I must grant HUD's motion to dismiss.

#### A. The Act 135 Petition Threatens Federal Interests

PCDC argues that sovereign immunity is not implicated because its Petition does not materially threaten HUD's interest in the Property. It contends that because it has not yet been decided whether conservatorship is warranted and if so, who should serve as conservator, HUD is operating under a "misplaced speculation as to a future discharge of its statutory lien." Resp. to Mot. to Dismiss at 10, ECF 19 ("Resp."). PCDC also avers that it is likely that, if HUD wanted, HUD itself could be appointed conservator through the Act 135 process. By PCDC's logic, if HUD would likely be appointed conservator of the very Property they seek to dispose of through their own scheme, there is no true conflict. And if HUD has already secured and remediated the

8

Property as they so claim, PCDC posits that it may terminate the Act 135 action after providing "adequate assurances" of the completion of repairs and payment of the statutorily mandated conservatorship costs.  68 P.S. § 1110.

This argument has superficial appeal, but it dissolves under closer scrutiny.  Pursuant to the HECM Program and broader National Housing Act objectives, HUD must protect against both discharge of its lien and *diminution* of its lien's value.  *See, e.g., Rust v. Johnson*, 597 F.2d 173, 179 (9th Cir. 1979) (explaining that allowing a local entity to sell property encumbered by a federal mortgage interest "would run the risk of substantially impairing the Government's participation in the home mortgage market and of defeating the purpose of the National Housing Act."); *Simon v. Cebrick*, 53 F.3d 17, 20 (3d Cir. 1995) (relying on *Rust*).  In any of PCDC's contemplated scenarios, Act 135 interferes with federal interests.

First, to displace PCDC as conservator, HUD would be required to rehabilitate the Property prior to sale pursuant to Act 135, a course it concluded was unfavorable under the Foreclosure Act. This in itself constrains its actions.  Several circuit courts, including the Third Circuit, have emphasized the importance of national agencies being able to operate without tailoring their practice to local obligations.  *See U.S. v. City of St. Paul*, 258 F.3d 750, 754 (8th Cir. 2001) ("HUD must be able to carry out its federal functions in a relatively uniform fashion.  HUD cannot be subjected to a vast multitude of municipal ordinances throughout the United States … requir[ing] the federal government to spend federal funds, post bonds, and obtain a local building permit."); *see also Oklahoma City v. Sanders*, 94 F.2d 323 (10th Cir. 1938); *United States v. City of Chester*, 144 F.2d 415, 420 (3d Cir. 1944).  And even if HUD was deemed to have stabilized the Property such that it could terminate the Petition, HUD would still be obligated under Act 135 to both

"provide adequate assurances" of the stabilization and to pay mandated costs, again potentially diminishing the return of HUD's HECM lien.  68 P.S. § 1110.

Furthermore, as I interpret Act 135, if a conservator is warranted, even if HUD assumes the role, PCDC's mere filing of the Petition entitles it to a statutory fee in some amount plus PCDC's attorney fees and costs.[11]  *Id.* § 1105(f)(4).

Alternatively, if the Petition proceeds and PCDC is appointed conservator, any repair or conservator costs would create a priority lien in its favor, taking precedence over HUD.  Given the substantial balance owed HUD and the vagaries of the market, the costs the conservator would be entitled to recover would jeopardize full satisfaction of HUD's interest.

Despite PCDC's attempt to harmonize the competing statutory schemes, virtually any outcome of the Petition poses some material threat to HUD's federally mandated objectives to protect against both discharge and diminution of its HECM lien's value.  The structure of Act 135 implicitly acknowledges this, requiring notice to affected parties.  *Id.* § 1104(d).

Because this lawsuit meaningfully implicates the federal government's interests, it may not proceed absent a waiver of sovereign immunity.

## B.  PCDC Does Not Establish an Unequivocal Waiver of Sovereign Immunity

"Under settled principles of sovereign immunity, 'the United States, as sovereign, is immune from suit, save as it consents to be sued.'"  *Shippensburg Urban Devs. v. United States*, 510 F.Supp.3d 284, 289 (E.D. Pa. 2020) (McHugh, J.) (citing *United States v. Dalm*, 494 U.S. 596,

---

[11] There has yet to be testimony or any evidentiary hearing on the conditions of the Property.  But, considering the facts pled in PCDC's initial Petition for conservatorship and HUD's finding that the Property was sufficiently abandoned to appoint a Field Manager, it is likely that the conditions would be deemed satisfied to proceed with the conservatorship process.  Resp. at 7-8.

608 (1990) (internal quotation marks omitted)).    Moreover "[a] waiver of the Federal

Government's sovereign immunity must be unequivocally expressed in statutory text . . . [and]

will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S.

187, 192 (1996) (internal citations omitted); *see also United States v. Bein*, 214 F.3d 408, 412 (3d

Cir. 2000); *Cudjoe v. Dep't of Veterans Affairs*, 426 F.3d 241, 246 (3d Cir. 2005).    A party suing

the United States bears the burden of establishing a clear waiver of sovereign immunity.    *Alnor*

*Check Cashing v. Katz*, 821 F. Supp. 307, 311 (E.D. Pa. 1993); *Malone v. Bowdoin*, 369 U.S. 643,

647 (1962).

28 U.S.C. § 2410 creates a limited waiver for certain property actions involving the United

States.[12]   PCDC's reliance on Section 2410 attempts to fit a square peg in a round hole, for the

Section only waives sovereign immunity in narrow circumstances that satisfy its criteria.

Specifically, Section 2410(a) contains a limited waiver for suits:

> (1) to quiet title to,
>
> (2) to foreclose a mortgage or other lien upon,
>
> (3) to partition,
>
> (4) to condemn, or
>
> (5) of interpleader or in the nature of interpleader with respect to,
>
> real or personal property on which the United States has or claims a mortgage or other lien.

An Act 135 petition does not readily fit within any of these categories.    Instead, the petition seeks

court authorization to enter and preserve a property by advancing costs and expenses that will be

secured by a priority lien.    And even if an Act 135 petition shares some characteristics with quiet

---

[12] PCDC previously argued in its motion to remand that Section 2410 was inapplicable to Act 135 petitions, now reversing course in an effort to salvage their claim.  *See* Rem. at 20.

title or foreclosure actions, mere likeness is insufficient to invoke the waiver; there must be a direct match. *See, e.g., Holowsko v. United States*, No. 96-0097, 1996 WL 469726, at \*2 (E.D. Pa. Aug. 13, 1996) (dismissing action that plaintiff claimed was "akin" to a partition action after holding that the government's waiver of sovereign immunity must be narrowly construed and action "akin to" a partition action did not fall within the scope of Section 2410's waiver); *Falik v. United States*, 343 F.2d 38, 40 (2d Cir. 1965) (action to remove federal tax lien from property was "not one contemplated by 28 U.S.C. § 2410(a), and cannot be entertained on any other ground"). Nor is an Act 135 petition "in the nature of interpleader," as it seeks to establish a *new* interest and lien for a potential conservator, rather than litigating the rights of multiple parties with *pre-existing* interests.[13] Accepting that waivers of sovereign immunity must be narrowly construed in favor of the sovereign, no reasonable reading of Section 2410's plain text covers an Act 135 petition.

Additionally, any action that falls within Section 2410's waiver affecting property on which the United States has a lien must also satisfy certain enumerated requirements set forth in Section 2410(c). These requirements are not satisfied here, further highlighting the ill fit of an Act 135 petition within this framework. Specifically, an action to foreclose a mortgage or other lien naming the United States as a party must seek a judicial sale. 28 U.S.C. § 2410(c). And "[w]here a sale of real estate is made to satisfy a lien prior to that of the United States," as would be the case with a lien established through Act 135, several protections must be in place. First, the United States must be provided a one-year redemption period. Second, where a debt is owed to the United

---

[13] *Cong. Talcott Corp. v. Gruber*, No. 89-4172, 1992 WL 52503, at \*4 (E.D. Pa. Mar. 13, 1992), *aff'd*, 993 F.2d 315 (3d Cir. 1993) ("An interpleader action is '[a]n equitable proceeding to determine the rights of rival claimants to property held by a third person having no interest therein.'") (citing *Black's Law Dictionary* 817 (6th ed. 1990)).

States, the government must be permitted to first ask for foreclosure of its own lien. And third, where property is sold to satisfy a first lien held by the United States, the Government must be permitted to bid at the sale the full amount of its debt and thereby acquire the property.

PCDC argues that Act 135 provides its own "broad" protections to HUD that parallel those required by Section 2410(c). But this is not supported by its briefing, nor by the text of Act 135 itself. Rather, the protections referenced by PCDC are merely the possibility that HUD could itself be appointed conservator, or remediate the Property's conditions and terminate the Petition, while still being responsible for associated costs, which, as discussed above, represents its own limitation of HUD's prerogatives. These "protections" are plainly not the same as the specific protections articulated by Congress in Section 2410(c). And there can be no waiver of the government's sovereign immunity for an action that does not meet Section 2410(c)'s specific requirements. *See United States v. John Hancock Mut. Life Ins. Co.*, 364 U.S. 301, 308 (1960) (concluding that state redemption laws in foreclosure proceeding did not apply to United States based on "well-settled rule that Congress may impose conditions upon a waiver of the Government's immunity from suit.") (citations omitted).

Without any alternative basis for jurisdiction, PCDC fails to establish an "unequivocal" waiver of sovereign immunity, and I must dismiss the case for lack of jurisdiction.

## IV.    Conclusion

I recognize that dismissal leaves the fate of 182 W. Durham Street in HUD's hands, rather than in the hands of a local non-profit with roots in the community. HUD represents that it has a plan to swiftly address the Property, but the record suggests that it is PCDC's Petition that has spurred this interest. Having elbowed PCDC to the side – as federal law permits it to do – the Court presumes that HUD will not allow the property to languish. Concerned neighbors were

present when the motion to dismiss was argued, showing that this is a matter of considerable

importance to the community.  Prompt action on HUD's part to foreclose and sell the property will

both protect its interest and that of the neighbors.[14]

    An appropriate order follows.

 /s/ Gerald Austin McHugh<br>
United States District Judge

---

[14] At argument, all counsel confirmed that Ms. Wells is in assisted living with no intent to return, and that her care will not be jeopardized by sale of the property.